UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL WAPPLER,

       Plaintiff,                                  Hon. Janet T. Neff

v.                                                      Case No. 1:08 CV 629

ERICA HUSS, et al.,

       Defendants.

_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendants' Motion for Summary Judgment, (dkt. #34), and Defendant Haskins' Motion for Summary Judgment, (dkt. #53). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motions both be **granted in part and denied in part**.

**BACKGROUND**

The following allegations are contained in Plaintiff's verified complaint. (Dkt. #1). Plaintiff was transferred to the IMAX facility on March 15, 2006. (Dkt. #1 at ¶ 42). From May 29, 2006, through May 31, 2006, the heat index in Plaintiff's cell exceeded 90 degrees, causing Plaintiff to experience shortness of breath, difficulty breathing, panic attacks, headaches, nausea, dizziness, irritability, excessive sweating, and "migraine like" headaches. (Dkt. #1 at ¶ 45).

On June 1, 2006, inmate Nathan Brewster, on behalf of Plaintiff and other prisoners, met with Warden Willie Smith and Assistant Deputy Warden Nannette Norwood. (Dkt. #1 at ¶¶ 50-51; Dkt.

#1, Exhibit B). Brewster requested that inmates be permitted to use fans inside their cells. (Dkt. #1 at ¶ 51; Dkt. #1, Exhibit B). Smith denied this request because "there have been no deaths of prisoners yet." (Dkt. #1 at ¶ 51; Dkt. #1, Exhibit B). On June 2, 2006, Plaintiff submitted a grievance in which he asserted that his cell lacked adequate ventilation. (Dkt. #1 at ¶ 46; Dkt. #1, Exhibit A). Plaintiff's grievance was denied on the grounds that the ventilation system "does work and meets all ACA standards." (Dkt. #1 at ¶ 47; Dkt. #1, Exhibit A).

On July 14, 2006, Plaintiff was examined by Dr. Migliorino. (Dkt. #1 at ¶ 54). The doctor requested that Plaintiff, because he suffers from asthma, be provided a fan. (Dkt. #1 at ¶ 54; Dkt. #1, Exhibit I). The doctor informed Plaintiff that the Michigan Department of Corrections "do not want the added expense of fans." (Dkt. #1 at ¶ 54). Dr. Migliorino's request was denied by a "medical officer" on July 18, 2006. (Dkt. #1 at ¶ 54; Dkt. #1, Exhibit I).

On "numerous days" throughout June, July, and August 2006, as well as "several days" in September and October 2006, the temperature in Plaintiff's cell approached or exceeded 100 degrees. (Dkt. #1 at ¶ 55). Because Plaintiff's cell lacked adequate ventilation or other means to control the temperature and humidity, Plaintiff experienced panic attacks, difficulty breathing, migraine like headaches, nausea, dizziness, irritability, and excessive sweating. (Dkt. #1 at ¶ 55). There were also "numerous days" during this time period in which the heat index in Plaintiff's cell was between 85 and 90 degrees, causing Plaintiff "to suffer heat related illness symptoms." (Dkt. #1 at ¶ 56).

On thirty-six (36) occasions during the months of May, June, July, August, September, and October 2007, the temperature in Plaintiff's cell approached or exceeded 100 degrees, causing Plaintiff to experience similar symptoms. (Dkt. #1 at ¶ 58). During this time period, there were likewise "numerous days" in which the heat index in Plaintiff's cell was between 85 and 90 degrees, causing

Plaintiff "to suffer heat related illness symptoms." (Dkt. #1 at ¶ 59). During the time periods in question, prison officials would often "lock-down" Plaintiff's housing unit, forcing him to remain in his cell "24 hours a day for several days in a row." (Dkt. #1 at ¶ 60).

In October 2007, Plaintiff against requested that he be permitted to use a fan in his cell. (Dkt. #1 at ¶ 64). Plaintiff's request was rejected. (Dkt. #1 at ¶¶ 65-69). On November 16, 2007, Plaintiff was placed on Step I Grievance Modified Access Status for filing "frivolous" and "vague" grievances. (Dkt. #1 at ¶ 74; Dkt. #1, Exhibit L). Plaintiff asserts that this action was taken in retaliation for his having filed several grievances concerning the heat issues described above. (Dkt. #1 at ¶¶ 75-76).

On May 26, 2008, Plaintiff "was subjected to a heat index in excess of 90 degrees. . .causing [him] to suffer heat related illness symptoms." (Dkt. #1 at ¶ 90). The following day, Plaintiff requested "a cell change due to heat." (Dkt. #1 at ¶ 91). Plaintiff's request was denied, despite the fact that acceptable cells were available. (Dkt. #1 at ¶¶ 92-95). On June 9, 2008, Plaintiff requested that he be permitted to "put something in the window to block the sun." (Dkt. #1 at ¶ 97). Plaintiff's request was denied and prison officials instead instructed Plaintiff to "splash water on his body frequently and air dry" and "to sit rather than lie down." (Dkt. #1 at ¶ 98).

Plaintiff initiated this action on July 1, 2008, against numerous prison officials alleging violations of his Eighth Amendment right to be free from cruel and unusual punishment and his First Amendment right not to be subjected to improper retaliation. Plaintiff has sued Defendants in their official and personal capacities seeking monetary and injunctive relief. Defendants now move for summary judgment.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative

evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

## ANALYSIS

I.        **Eleventh Amendment Immunity**

In his complaint, Plaintiff states that he is suing "all Defendants" in both their personal and official capacities. Defendants assert that they are entitled to immunity under the Eleventh Amendment as to those claims asserted against them in their official capacity. The Court partly agrees.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. This provision has long been interpreted as precluding "federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Board of Regents*, 528

U.S. 62, 72-73 (2000). Accordingly, the Eleventh Amendment generally precludes federal court actions against a State unless that state has waived its sovereign immunity or consented to suit in federal court. *See Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989)).

The State of Michigan "has not consented to being sued in civil rights actions in the federal courts." *Johnson v. Unknown Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004). An action asserted against a State official in his official capacity is considered an action against the State. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). An exception to this general rule exists, however, for claims seeking prospective injunctive or declaratory (non-monetary) relief compelling a state official (in his official capacity) to comply with federal law. *See Ex Parte Young*, 209 U.S. 123 (1908); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507-08 (6th Cir. 2008) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

As previously noted, Plaintiff seeks injunctive and monetary relief. The Court finds that Defendants are entitled to sovereign immunity only as to Plaintiff's claims for monetary damages asserted against them in their official capacity. The Court recommends, therefore, that Plaintiff's claims for monetary damages asserted against Defendants in their official capacity be dismissed.

**II.      Qualified Immunity**

Defendants next assert that they are entitled to qualified immunity because Plaintiff "has not demonstrated the Defendants' violation of clearly established federal law." The Court disagrees.

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of harassing litigation. *See Davis v. Scherer*, 468 U.S. 183, 195

(1984). As is well recognized, they can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages, and if unjustified lawsuits are quickly terminated. *Id.* Generally, when government officials perform discretionary functions, they are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also, Behrens v. Pelletier*, 516 U.S. 299, 301 (1996). The question of whether a defendant enjoys qualified immunity is a question of law for the Court to resolve. *See Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001).

When evaluating claims of qualified immunity, the Court employs a two-step analysis. The Court first determines "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If such fail to establish a violation of the plaintiff's constitutional rights, the defendant is entitled to immunity. *See Callahan*, 129 S.Ct. at 816. On the other hand, if the facts establish a violation of the plaintiff's constitutional rights, the Court must then determine whether the right in question was "clearly established" at the time the defendant acted. The defendant is entitled to qualified immunity unless his "conduct violated a clearly established constitutional right." *Id.*

Where neither the motion for qualified immunity nor the opposition thereto is supported by evidence, the first step of the qualified immunity analysis focuses on the allegations in the plaintiff's complaint and whether such state a claim for violation of the plaintiff's constitutional rights. If, on the other hand, the motion for qualified immunity and/or the opposition thereto are supported by evidence, such must be considered pursuant to the summary judgment standard articulated above. Thus, if the evidence submitted by the parties demonstrates the existence of a genuine factual dispute, the resolution

of which is essential to determining whether the defendant violated the plaintiff's constitutional rights, qualified immunity is not warranted. However, if the evidence establishes that the defendant did not violate the plaintiff's constitutional rights, qualified immunity is appropriate. *See, e.g., Scott v. Harris*, 550 U.S. 372, 377-86 (2007) (officer entitled to qualified immunity where evidence was such that "no reasonable jury" could have concluded that officer violated the plaintiff's constitutional rights).

   Generally, to find a clearly established constitutional right, the district court "must find binding precedent by the Supreme Court, its Court of Appeals or itself." *Fisher v. Harden*, 398 F.3d 837, 845 (6th Cir. 2005) (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988)). In extraordinary circumstances, however, the decisions of other courts may suffice if such decisions "both point unmistakably to the unconstitutionality of the conduct complained of and are so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Fisher*, 398 F.3d at 845-46 (quoting *Seiter*, 858 F.2d at 1177). A single idiosyncratic opinion from another circuit's court of appeals, however, is insufficient to put a defendant on notice of how the Sixth Circuit might decide the issue in question. *See Davis v. Holley*, 835 F.2d 1175, 1182 (6th Cir. 1987).

   In determining whether a defendant is entitled to qualified immunity, the focus is on the objective legal reasonableness of his actions in light of clearly established law as it existed when he engaged in the challenged conduct. *See Anderson*, 483 U.S. at 640; *Harlow*, 457 U.S. at 818; *Fisher*, 398 F.3d at 845. Accordingly, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Fisher*, 398 F.3d at 845 (quoting *Saucier*, 533 U.S. at 202).

Finally, while it "is often appropriate" to evaluate qualified immunity claims by analyzing the two steps (identified above) in sequence, such is no longer mandated. *See Callahan*, 129 S.Ct. at 818. As the *Callahan* Court recently stated, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Defendants have submitted evidence which they believe demonstrates that Plaintiff was not retaliated against and has not suffered a violation of his Eighth Amendment rights. The Court agrees with Defendants as to Plaintiff's First Amendment retaliation claim, but disagrees with respect to Plaintiff's Eighth Amendment claims.

    A.    Retaliation

Plaintiff asserts that Defendants Smith, Groves, Breedlove, and Klinesmith violated his constitutional rights by placing him on modified grievance status in retaliation for filing grievances. (Dkt. #1 at ¶¶ 74-78, 121).

The elements of a First Amendment retaliation claim are well known: (1) the plaintiff was engaged in constitutionally protected conduct, (2) the plaintiff suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action - in other words, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

Even if Plaintiff could establish the first two elements of the analysis, he has failed to demonstrate that he suffered a sufficiently adverse action. As the Sixth Circuit has observed on several occasions, being placed on modified access status in response to filing administrative grievances would not deter a person of ordinary firmness from filing non-frivolous grievances. *See, e.g., Jackson v. Madery*, 158 Fed. Appx. 656, 660 (6th Cir., Nov. 17, 2005); *Walker v. Michigan Dep't of Corrections*, 128 Fed. Appx. 441, 446 (6th Cir., April 1, 2005); *Kennedy v. Tallio*, 20 Fed. Appx. 469, 471 (6th Cir., Sept. 26, 2001). As Plaintiff's allegations of retaliation fail to state a claim of constitutional violation, the Court recommends that Defendants' motion for qualified immunity be granted as to Plaintiff's retaliation claims.

### B. Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The analysis by which a prison official's conduct is evaluated consists of two-steps. The Court must first determine, objectively, whether the alleged deprivation was sufficiently serious. In this respect, Plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

With respect to the objective prong of the analysis, contemporary standards of decency determine whether conditions of confinement are cruel and unusual. *See Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the

"minimal civilized measure of life's necessities." *Hadix*, 367 F.3d at 525 (quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)). Subjecting prisoners to conditions of excessive heat and humidity deprives them of the "minimal civilized measure of life's necessities." *See, e.g., Hadix v. Caruso*, 492 F.Supp.2d 743, 751 (W.D. Mich. 2007) (citations omitted).

If the objective test is met, the Court must then determine whether the official acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. In other words, was the individual deliberately indifferent to inmate health or safety. *Id.* In sum, to establish that a prison official acted with deliberate indifference, Plaintiff must "present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 829, 847).

Plaintiff asserts that the conditions in which he was incarcerated violated his Eighth Amendment rights. Defendants have submitted evidence which they assert entitles them to relief. Plaintiff has submitted evidence in opposition thereto. A review of the parties' submissions persuades the Court that Defendants are not entitled to relief at this juncture.

Defendants have submitted an affidavit from Defendant Smith, who serves as warden of IMAX. (Dkt. #35, Exhibit B). Smith asserts that the IMAX facility is in compliance with the temperature standards articulated by the American Correctional Association (ACA). Smith asserts that the IMAX "ventilation system works adequately and meets all ACA standards" and "is regularly checked to ensure there is enough airflow throughout the building." Smith acknowledges that prisoners at IMAX are not allowed to possess fans in their cells. According to Smith, "whenever the heat index (combination of high temperature and high humidity) is 90 degrees Fahrenheit or above," a "Heat Alert"

is issued, in response to which prison officials are "directed to take appropriate action based on the facility and housing unit capabilities, physical plant considerations and security level." *Id.*

Defendants have submitted an affidavit from Defendant Haskins. (Dkt. #56). Haskins asserts that "[t]he facility ventilation system works adequately and meets all ACA standards. The system is regularly checked to ensure there is enough airflow throughout the building." Haskins asserts that "[l]arge fans have been placed in the units and are being used to circulate the air." Haskins further asserts that the "cells at [IMAX] are equipped with a ventilation system/air vent." *Id.*

Defendants have also submitted the results of three inspection reports conducted at IMAX in August 2006, August 2007, and August 2008. (Dkt. #35, Exhibits C-E). According to the results of these inspections, the temperature conditions in the IMAX housing units were in compliance with Michigan Department of Correction (MDOC) policy. Specifically, these inspections reported that the temperature in IMAX housing units ranged between 75-84 degrees. These inspections further reported that the "ventilation" and "cell/room vents" were in compliance with MDOC policy. *Id.*

The evidence submitted by Defendants fails to establish that the conditions under which Plaintiff is incarcerated do not violate the Eighth Amendment. The inspection reports on which Defendants place such great reliance are not, in the Court's estimation, as definitive as Defendants assert. For example, while these reports suggest that the temperature in the IMAX housing units was maintained at an acceptable level, these reports neither indicate the time of day that the reported temperature readings were measured nor indicate the contemporaneous outdoor temperature. Without this information, it is impossible to accord any significance to this aspect of the inspection reports. Perhaps of even greater significance, these inspection reports do not indicate whether the reported temperature readings were taken inside a prison cell(s) or in the common areas of the housing units. In this respect,

Plaintiff asserts that due to the inadequate ventilation the temperature inside his prison cell exceeds the temperature outside his cell. (Dkt. #1 at ¶¶ 55-56). Plaintiff has also submitted affidavits from thirty-two (32) prisoners asserting the same. (Dkt. #69, Exhibits 17-48).

Plaintiff asserts that "[t]here is no fresh air inlet into [his] cell", but instead "only a small exhaust vent located over the sink near the ceiling." (Dkt. #70). Plaintiff asserts that this vent fails to adequately ventilate his cell. *Id.* Plaintiff has submitted affidavits from thirty-two (32) prisoners who each assert that the exhaust vents in their cells are "continually" inoperable and fail to operate for "days at a time." (Dkt. #69, Exhibits 17-48). While the inspection reports discussed above indicate that the "ventilation" and "cell/room vents" were in compliance with MDOC policy, these reports do not indicate the basis for this conclusion. For example, the reports do not indicate whether the inspector examined the ventilation system in every cell, examined only certain "representative" cells, or relied on a different methodology altogether. In this regard, Plaintiff asserts that prison officials "have never checked the vents" in his cell. (Dkt. #1 at ¶ 110).

As noted above, Defendant Haskins asserts that "[l]arge fans have been placed in the units and are being used to circulate the air." Plaintiff, however, asserts that these fans fail to lower the temperature in his cell, in part because prison officials refuse to open the food slot on his door thereby preventing any of the fan-driven air from entering his cell. (Dkt. #1 at ¶¶ 113-14). Plaintiff has also submitted affidavits from thirty-two (32) prisoners who each assert that "the fans in the hallways do nothing to help the prisoners inside their cells." (Dkt. #69, Exhibits 17-48).

The evidence submitted thus far reveals the existence of a genuine factual dispute as to whether Plaintiff is being confined "under conditions posing a substantial risk of serious harm." As to the subjective prong of the analysis, Plaintiff asserts that he has repeatedly brought this issue to the

attention of prison officials who have consistently failed to remedy the conditions under which he is incarcerated. This is evidenced by the grievances attached to Plaintiff's complaint, as well as the allegations in Plaintiff's verified complaint. Defendants have failed to establish that they were unaware of the risk alleged by Plaintiff or took reasonable measures in response to such.

Finally, Defendants assert that they are entitled to relief because Plaintiff "has not demonstrated that he suffered adverse health effects from heat exposure." This argument is absurd. Plaintiff has not asserted a claim that he suffered a delay in medical treatment, in which case Plaintiff's failure to submit medical evidence that he suffered "adverse health effects from heat exposure" might be relevant. *See Napier v. Madison County, Kentucky*, 238 F.3d 739 (6th Cir. 2001); *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004). Plaintiff instead asserts that he is being incarcerated under conditions that pose a substantial risk of serious harm to his health and threaten his life. Defendants are certainly aware of the safety threat posed by incarcerating inmates in conditions which expose them to excessive heat and humidity, as this issue has been explored in detail in the *Hadix* litigation. Furthermore, as the United States Supreme Court has observed, "it is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions'" and "a remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted). The Court, therefore, finds that whether Plaintiff has submitted medical evidence of the allegedly adverse health effects he has suffered as a result of the aforementioned prison conditions is utterly irrelevant.

In sum, when considering the deficiencies in Defendants' evidentiary submissions, as well as the evidence submitted by Plaintiff, the Court finds that legitimate factual questions persist concerning whether the conditions under which Plaintiff is incarcerated violate his Eighth Amendment rights. The

Court, therefore, recommends that Defendants' motion for qualified immunity be denied as to Plaintiff's Eighth Amendment claims.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that Defendants' Motion for Summary Judgment, (dkt. #34), and Defendant Haskins' Motion for Summary Judgment, (dkt. #53), both be **granted in part and denied in part**. Specifically, the undersigned recommends that Plaintiff's First Amendment retaliation claims be dismissed. With respect to Plaintiff's Eighth Amendment claims, the undersigned recommends that Plaintiff's claims for monetary damages asserted against Defendants in their official capacity be dismissed, but that otherwise, such claims go froward.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date:  June 30, 2009               /s/ Ellen S. Carmody
                                   ELLEN S. CARMODY
                                   United States Magistrate Judge